## UNITED STATES v. ONE CAR LOAD OF CORNO HORSE AND MULE FEED..

(District Court, M. D. Alabama, N. D.    May 31, 1911.)

1. **Food (§ 2*)—Definition—Food and Drugs Act.**

    The term "food," as used in the food and drugs act (Act Cong. June 30, 1906, c. 3915, 34 Stat. 768 [U. S. Comp. St. Supp. 1909, p. 1187]), includes all articles used as food by man or other animals, whether simple, mixed, or compound.

    [Ed. Note.—For other cases, see Food, Dec. Dig. § 2.*

    For other definitions, see Words and Phrases, vol. 3, p. 2856.]

2. **Food (§ 14*)—"Adulterated"—Compounds—Horse and Mule Feed.**

    The food and drugs act (Act Cong. June 30, 1906, c. 3915, 34 Stat. 768 [U. S. Comp. St. Supp. 1909, p. 1187]) provides that food shall be deemed adulterated if any substance has been mixed with it to lower or injuriously affect its quality or strength, or if it contains any added poisons or deleterious ingredient which may render the article injurious to health, or if it consists wholly or in part of a filthy, decomposed, or putrid animal or vegetable substance. Section 8 contains a proviso that food which does not contain any added or deleterious ingredients shall not be deemed adulterated, and if in the case of mixtures or compounds, known as articles of food by their own distinctive name, such name shall be accompanied on the same label or brand with a statement of the place where the article has been manufactured or produced, and in the case of articles labeled, branded, or tagged so as to plainly indicate that they are compounds and the word "compound," "imitation," or "blend," as the case may be, is plainly stated on the package in which it is offered for sale. *Held,* that where a substance sold under the name "Corno Horse and Mule Feed" was contained in a package branded: "Corno Horse and Mule Feed. Mixture of ground alfalfa, oats, corn, flax bran, oat and hominy feeds, made by the Corno Mills Company, East St. Louis, Illinois"—followed by a guaranteed analysis, such substance, being a compound and so described on the package, was not adulterated, because it contained a quantity of oat hulls mixed and packed therewith in excess of the amount normally present in oat feed consisting of whole ground oats.

    [Ed. Note.—For other cases, see Food, Dec. Dig. § 14.*

    For other definitions, see Words and Phrases, vol. 1, pp. 210–212.]

3. **Evidence (§ 51*)—Judicial Notice—Meaning of Terms—Sources of Information.**

    Where a court is required to take judicial notice of the meaning of a term as a matter of law, it may resort to any authoritative sources of information to enlighten its judgment.

    [Ed. Note.—For other cases, see Evidence, Cent. Dig. § 72; Dec. Dig. § 51.*]

4. **Food (§ 15*)—Misbranding—"Oat Feed."**

    Since the term "oat feed" in its ordinary acceptation does not mean the whole oat grain, either crushed or ground, but instead means that part of the grain which remains after the miller subtracts the portions useful for human food, consisting of nubbins, middlings, hulls, and oat dust,

a compound substance sold in packages under the name "Corno Horse and Mule Feed," and described on the package as a "mixture of ground alfalfa, oats, corn, alfalfa, oat and hominy feeds," with the name of the manufacturer and place of manufacture, followed by an analysis of its contents, was not misbranded in violation of the food and drugs act (Act Cong. June 30, 1906, c. 3915, 34 Stat. 768 [U. S. Comp. St. Supp. 1909, p. 1187]), because it contained an excess of oat hulls in compound and not the whole ground oats.

[Ed. Note.—For other cases, see Food, Cent. Dig. § 14; Dec. Dig. § 15.*]

5. WORDS AND PHRASES—"LANGUAGE."
"Language" is the expression of thought by means of spoken or written words which are but signs of ideas.

[Ed. Note.—For other definitions, see Words and Phrases, vol. 5, p. 3990.]

6. FOOD (§ 5*)—FOOD AND DRUGS ACT—COMPOUNDS.
Under the food and drugs act (Act Cong. June 30, 1906, c. 3915, 34 Stat. 768 [U. S. Comp. St. Supp. 1909, p. 1187]), relating to the sale of compounds, compounds known as articles of food can be sold under their own distinctive name so long as no deleterious matter is put into the product and the label states where it is manufactured and it is not an imitation sold under the distinctive name of another article.

[Ed. Note.—For other cases, see Food, Dec. Dig. § 5.*

What constitutes a violation of pure food regulations, see note to Brina v. United States, 105 C. C. A. 559.]

Information by the United States against One Car Load of Corno Horse and Mule Feed. Libel dismissed.

This is an information exhibited against one car load of "Corno Horse and Mule Feed," praying a seizure and condemnation for confiscation, under section 10 of the food and drugs act approved June 30, 1906 (Act June 30, 1906, c. 3915, 34 Stat. 771 [U. S. Comp. St. Supp. 1909, p. 1193]).

The libel as amended is based on the following grounds:

"First, for that said food is adulterated in this, that the same purports to be, and is so labeled and branded, 'a mixture of ground alfalfa, oats, corn, flax bran, oat and hominy feeds,' when in fact and in truth the same is mixed and packed with a foreign substance, to wit, oat hulls, so as to reduce and injuriously affect its quality and strength. Second, for that said food is adulterated in that a large quantity of the substance, to wit, oat hulls, has been mixed and packed with the same so as to reduce or lower or injuriously affect its quality or strength. Third, for that said original packages are misbranded in violation of section 8 of said food and drugs act, in this, that they purport to contain a mixture of ground alfalfa, oats, corn, and flax bran, oat and hominy feed, which label or brand is false or misleading, in that the contents of said packages contain a foreign substance, to wit, a quantity of oat hulls mixed and packed therewith in excess of the amount normally present in oat feed, one of the constituent parts named in the brand on said package."

The usual process having issued, a seizure was made, and Hudson and Thompson claimed the property and answered the libel, denying that the Corno horse and mule feed was adulterated or misbranded, but admitting the interstate character of the shipment, the description of the brands thereon, etc. A jury trial was waived.

Subsequently, the parties agreed on a statement of facts, as follows:

"That the car load of Corno horse and mule feed against which this libel is filed was contained in original bags or sacks of about 100 pounds and of about 175 pounds each, and that each of said original packages, being said sacks or bags, was branded: 'Corno Horse and Mule Feed. Mixture of ground alfalfa, oats, corn, flax bran, oat and hominy feeds, made by the Corno Mills Company, East St. Louis, Illinois. Guaranteed analysis: Protein

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

10%; sugar and starch, 58.5%; fat, 3.5%; fiber, 12%.' Said brand being contained on each sack and label connected therewith. That the said Corno horse and mule feed is an article of food within the meaning of the food and drugs act. That on February 8, 1909, the above-described bags or sacks of Corno horse and mule feed were received in the city of Montgomery, in the state of Alabama, by Hudson and Thompson, claimants herein, a partnership composed of W. M. Hudson and J. A. Thompson, and that the car load of Corno horse and mule feed, aforesaid, was shipped to said Hudson and Thompson on or about, to wit, February 4, 1909, from the city of East St. Louis, in the state of Illinois, by the Corno Mills Company of said city of East St. Louis, and that said car load or a large portion thereof of the Corno horse and mule feed, aforesaid, at the time of the filing of this libel, was in the original unbroken packages and in the possession of said Hudson and Thompson, in the city of Montgomery, state of Alabama, in the Northern division of the Middle district of Alabama, and within the jurisdiction of this court. It is further admitted that there was present in the Corno horse and mule feed, aforesaid, seized under the libel herein, a quantity of oat hulls in excess of the amount that would have been naturally and normally present in case whole ground oats had been used in lieu of the same amount of oat feed—using the term 'oat feed' here according to the construction contended for by the claimants herein, namely, as a by-product consisting of the oatmeal or rolled oat factory, said by-product consisting of the entire residue of the oats after the manufacture of the oats into food for human consumption, and consisting of the middlings, nubbins, oat dust, and hulls. By this admission is meant that there was used in the Corno horse and mule feed aforesaid a quantity of the by-product of the rolled oat mill consisting of the oat hulls, middlings, nubbins, and dust as above described."

The defense also admitted that "oat feed" contains less of protein and more of hulls than an equal amount of whole ground oats. A great volume of the testimony was taken from manufacturers, millers, middlemen, brokers, and consumers as to the meaning of the term "oat feed," and how it was used and understood in commerce and trade and among the people generally.

Warren S. Reese, U. S. Atty.

Carter, Collins, Jones & Barker and J. Manly Foster, for claimant.

JONES, District Judge (after stating the facts as above). [1] The term "food," as used in the food and drugs act, includes all articles used for food by men or other animals, whether simple, mixed, or compound.

[2] An "article of food" is deemed to be adulterated, "if any substance has been mixed or packed with it so as to reduce or lower or injuriously affect its quality or strength," or "if any substance has been substituted, wholly or in part, for the article," or "if any valuable constituent of the article has been, wholly or in part, abstracted," or "if it contains any added poisonous or other added deleterious ingredient which may render such article injurious to health," or "if it be mixed, colored, powdered, coated or stained whereby damage or inferiority is concealed," or "if it consists, wholly or in part, of a filthy, decomposed or putrid animal or vegetable substance," etc.

An article of food is "misbranded," within the meaning of the statute, if it be "an imitation of, or offered for sale under the distinctive name of another article," or, "if it be labeled or branded so as to deceive or mislead the purchaser," or "if in package form and the contents are stated in terms of weight and measure they are not plainly and correctly stated on the outside of the package," or "if the pack-

age or label containing it shall bear any statement, design or device regarding the substances or ingredients contained therein, which statement, design or device shall be false or misleading in any particular."

Section 8 contains a proviso:

"That an article of food which does not contain any added poisonous or deleterious ingredient, shall not be deemed to be adulterated or misbranded in the following cases: First. In the case of mixtures or compounds which may be now or from time to time hereafter known as articles of food under their own distinctive name, and not an imitation of or offered for sale under the distinctive name of another article, if the name be accompanied on the same label or brand with a statement of the place where said article has been manufactured or produced. Second. In the case of articles labeled, branded or tagged so as to plainly indicate that they are compounds, imitations or blends, and the words 'compound,' 'imitation' or 'blend,' as the case may be, is plainly stated on the package and the package in which it is offered for sale."

The manufacturer, without violating any of the provisions of the statute against adulteration, may mix any number of constituents in his compound, so long as these constituents are not poisonous or deleterious to health and he gives the compound a distinctive name and states where it is manufactured. The matter thus produced is "the article of food" whose quality and strength the statute seeks to preserve, and the nature of the product in these respects is fixed and determined by the elements which enter into it. How is it possible chemically, or in the eye of the law, to "lower or injuriously affect" the quality or strength of the particular "article of food," whose characteristics are thus produced, and safeguarded by the law as thus produced, under its own distinctive name, by mixing in the compound anything which may be lawfully incorporated therein? Putting in a mixture things which may be lawfully blended therein cannot amount to adulteration of the blend, since, other things aside, the statute declares, its other conditions being complied with, the blend shall not thereby "be deemed to be adulterated."

Corno horse and mule feed is a compound, sold under its own distinctive name. One of the constituent elements which fix and determine the quality and strength of that blend is "oat feed." The incorporation of "oat feed" in the blend, unless it be noxious or deleterious to health, cannot adulterate the blend which has its own standard, quality, and strength, made up in part of "oat feed." To make a case of adulteration it must be shown that "oat feed" contains noxious qualities, as described in the statute. Otherwise, it is manifest that the incorporation of "oat feed" in the blend has not mixed or packed any substance with the blend—"Corno horse and mule feed"— so as to reduce or lower or injuriously affect *its* quality or strength," or that "any valuable constituent of the article of food has, wholly or in part, been substracted from the blend, or that any substance has been substituted, wholly or in part," for the "article of food." Corno horse and mule feed is not an imitation of, or offered for sale under the distinctive name of, another article, but is sold under its own distinctive name, and the label or brand contains a statement which shows that it is a mixture, and truthfully states its constituents and the place where the article was manufactured or produced. There

is no charge of removal of any part of the contents of the package as originally put up. It is not claimed or proved that the matter of which the "oat feed" consists is deleterious in any way to man or other animal, or charged that the provisions of the statute against adulteration have been violated in any way, save by putting "oat feed" on the label. The libel must fail as to the charges of adulteration.

The label here does not contain any design or device of any kind, and whether there has been a misbranding within the meaning of the statute must depend on the words employed in the label to describe the Corno horse and mule feed. Save by the declaration in the statute as to what a label shall not contain, no standards are prescribed for brands or labels, or the minuteness or particularity in which they must indulge in describing an article of food. The statute should be liberally construed to effect its beneficent purposes; but no rule of construction permits us to so construe its language that the statute shall operate as a snare or trap to the honest manufacturer or producer, who brands or labels his products in descriptive words or devices, which fairly inform the purchaser of the nature and ingredients of the product offered for sale, and are not so framed as to deceive or mislead the ordinary purchaser.

The parties have deemed it important to introduce a vast mass of testimony as to the meaning of the term "oat feed." As the court is sitting both as trier of the law and the facts, it is deemed unnecessary to determine whether the meaning of the term "oat feed," as here used, is a matter of pure law, or whether it is a question of fact, to be ascertained as by a jury from the whole evidence.

[3] If it be a matter of law of which the court must take judicial notice, the court may nevertheless resort to any authoritative sources of information to enlighten its judgment, and, on the other hand, if it be a question of fact, the judge sitting as a jury may well determine the meaning of the words here as a question of fact, according to the weight of the evidence.

[4] The government claims that "oat feed" means the whole grain of the oat, either crushed or ground, and that the ordinary purchaser of the blend so understands the term "oat feed" used in the label, though it admits the manufacturer gives a different meaning to it. The manufacturer claims, on the contrary, that "oat feed" means the by-product of the rolled oat or oatmeal mills: that part of the grain which remains after the miller subtracts from it the portions useful for human food, consisting of nubbins, middlings, hulls, and oat dust, the entire residue of the grain after the oat is prepared by the manufacturer for human consumption; and that the term has long been so understood in commerce and trade and by the public at large.

The whole trend of the evidence is that in nearly all by-products the word "feed," when connected with a grain, is used to denote the by-product from that grain, meaning the residue of the grain after it is manufactured into food for human consumption, and that, when it is intended to designate the whole grain or the crushed grain entering into articles of food for man, the thing is spoken of as "food" and not "feed."

The government admits that the words "hominy feed" mean the by-product from the hominy mills and are so used, known, and understood. It admits that other terms are used in the same way to denote other products. The evidence leaves no doubt that the terms "barley feed," "rye feed," "wheat feed," buckwheat feed," "mixed feed," and other similar terms, are used to designate those by-products, and are popularly known and understood as such. It shows that "oat feed" is different from whole ground oats or crushed oats, and that the difference is clearly apparent to the naked eye, and that at all times the price of "oat feed" is considerably lower than that of the ground oats. It further shows that "oat feed" seldom reaches the consumer as a separate commodity, but is most generally offered for sale as an ingredient of a mixed feed, or, as it is denominated in many of the state laws, "concentrated feed stuff." It also shows that the term "ground oats" is universally used to designate that product, and that likewise "crushed oats" is used to designate the oats when they are crushed, and that "chopped oats" or "oat chops" is used to designate the chopped oats, and there is no evidence to show that any of the products have ever been designated or understood to mean the same thing as "oat feed." Many of the states have recognized "oat feed" as a by-product of the oat, in their food laws, notably New York, Maine, Louisiana, Iowa, Wisconsin, Virginia, New Hampshire, New Jersey, Texas, Florida, Connecticut, Illinios, Michigan, Massachusetts, Maryland, and Tennessee. Bulletins from various state agricultural experiment stations were offered in evidence, showing that "oat feed" is recognized as a by-product in New Jersey, Georgia, Ohio, Tennessee, and Virginia.

Among other evidence introduced by the defense was a letter of January 27, 1910, from the board of food and drug inspection, concurred in by all its members, and addressed to counsel in this case. It is given in full because it shows the government was by no means certain as to the correctness of its contention as to the meaning of "oat feed." It indicates that its inquiries tended to show that "oat feed" in fact means the by-product of the oat mill, but that its opinion was that it should not be known as "oat feed," which the board thought should include ground oats only. In this particular, it is aside the issue, for the question is what "oat feed" describes in our language, and not what it ought to describe. Neither the Secretary of Agriculture nor any official intrusted with the administration of the food and drugs act has any authority to change the meaning of words. The letter, omitting address and signature, is as follows:

"Your letter of January 15, 1910, in reference to the cases reported to the Department of Justice against the Corno Mills Company of East St. Louis, Ill., for prosecution under the food and drugs act, has received careful consideration. Your statement is noted that you are of the opinion that unless the Department of Agriculture has changed its view as to the meaning of the term 'oat feed' the proceedings against the shipment of Corno horse and mule feed seized at Valdosta, Georgia, should not be dismissed, in view of the promise of this department of an early judicial construction of the meaning of the term and the completion of your arrangements for the taking of all necessary evidence.

"You are advised in reply that the records of the board do not show that a promise has been made by the board that the meaning of the term 'oat feed' shall be construed by the courts at an early date. As you are aware, such promise, even if made by the board, would be ineffective. The duties of the board of food and drug inspection end with the collection of evidence and the preparation of reports of violations of the food and drugs act. When the evidence is complete and the circumstances of the violations appear to the Secretary of Agriculture to warrant such action, the cases are reported to the Department of Justice for prosecution, and the time when a particular case may come on for trial rests with the Department of Justice. After cases are so reported, whenever additional evidence bearing on the questions involved comes to the knowledge of the board, such evidence is also brought to the attention of the Secretary of Agriculture for consideration whether the same should be transmitted to the Department of Justice.

"When the question was presented to the board whether proceedings should be instituted against the shipment seized at Valdosta, Georgia, such action was recommended on the statement of the Bureau of Chemistry that the term 'oat feed' properly includes only ground whole oats, and the amount of oat hulls found on examination of samples to be present in the product was considerably in excess of the amount which normally would be present in a product containing ground whole oats. Analysts of the Bureau of Chemistry were of the opinion that the term 'oat feed' as applied to oat-offal or by-products of the oatmeal, is misleading, and the Bureau of Chemistry has in its possession affidavits of dealers in cattle feed and grain who express the opinion that the product sold in the trade as 'oat feed,' which consists largely of oat hulls, should not be known as 'oat feed,' and that the term 'oat feed' should include ground oats only.

"Inasmuch as the foregoing views of the Bureau of Chemistry were earnestly controverted by the Corno Mills Company and other manufacturers of cattle feeds and many dealers in cereal products, letters of inquiry were addressed by the solicitor of this department to representative manufacturers and dealers, and replies were received indicating that 'oat feed' is generally understood among the trade to be the by-product of the oatmeal mill and consisting of oat hulls, oat nubbins, oat dust and middlings. It further appears from these replies that screenings from oat elevators are also known and sold as 'oat feed' and that ground whole oats are never sold as 'oat feed' but as ground oats.

"In view of the difference of opinion as to the significance of the term 'oat feed,' as set forth above, the crop technologist in charge of grain standardization in the Bureau of Plant Industry in this Department, who has a thorough knowledge of the grain industry in this country, was consulted. The crop technologist stated, so far as he is informed, the term 'oat feed' in the grain trade means the by-products of the oat mill, including oat hulls, oat nubbins, oat dust, middlings, and screenings from oat elevators; he further stated that ground whole oats are not designated as 'oat feed' because ground whole oats are a superior product and command a higher price in the market than oat feed.

"When, therefore, the United States attorney in charge of the proceedings against the seizure at Valdosta requested the opinion of the Department of Agriculture concerning the disposal of the case, in view of the stipulation which had been entered into with the defendants for the taking of testimony, he was informed by the solicitor of all the facts hereinbefore related in reference to the meaning of the term 'oat feed' and was advised that the Department of Agriculture was satisfied to leave to his discretion the question whether the case should be prosecuted or dismissed. After consideration of the matter, the United States attorney decided to dismiss the case.

"When the department was advised of this action of the United States attorney, it was deemed advisable to inform the United States attorneys at Montgomery, Alabama, and Danville, Illinois, to whom cases involving the same question had been referred for prosecution, of all the facts within the knowledge of the Department of Agriculture concerning the

meaning of the term 'oat feed.' They have been informed accordingly, and have been requested to advise the solicitor of this department whether, after consideration thereof, they are of the opinion that the cases pending in their respective districts based on shipments of Corno horse and mule feed, should be prosecuted or dismissed. The department is not yet in receipt of the opinions of the United States attorneys. Pending the decision of the United States attorney at Montgomery, Alabama, and the United States attorney at Danville, Iillinois, whether cases can be maintained under the food and drugs act which are based on the significance applied to the term 'oat feed' by the Bureau of Chemistry, the board of food and drug inspection has not determined whether cases shall be, reported for prosecution in the future in which the same issue is presented. When the replies of the United States attorneys, are received, however, the board will consider and determine what attitude shall be taken in this particular, and when a decision has been reached you will be informed accordingly."

The testimony introduced on behalf of the defense was from manufacturers, middlemen, wholesalers, retailers, and consumers, and covered not only the United States, but two foreign countries as well, and showed that in them for a great many years the term "oat feed" has been used and understood not only by the manufacturer and all classes of middlemen, but also by the ultimate consumer, to mean the by-product of the rolled oat or oatmeal mills, in the same way that other by-products have been known by similar names. No witnesses, except Mr. Brown, testified that he ever heard the term "oat feed" applied to whole, ground, or crushed oats. Dr. Vorhees, of the New Jersey Experiment Station, and Mr. Fuller, of the Indiana Experiment Station, showed very clearly from their examinations and experience the term "oat feed" in commercial usage and wherever used in trade and commerce is known and understood to be the by-product of the oat mill.

The defense also introduced Bulletin No. 108, issued by the Department of Agriculture, April 2, 1908, regarding the "Commercial Feeding Stuffs of the United States." This is a very valuable paper prepared by Dr. J. K. Haywood, Chief of the Miscellaneous Laboratory, and one of the principal witnesses for the government in this case, Mr. Warner, the Chief Chemist, and Mr. Howard, Chief of the Microchemical Laboratory. The paper is the result of chemical examinations of the various stock foods, their methods of manufacture and analyses of commercial feeding stuffs conducted at a number of the state experiment stations. Table 17 of "Oat Feed" deals with the contents of seven different samples of "oat feed." The bulletin says, on page 12:

"The main source of oat feed is the breakfast food factories. In many cases they are composed almost entirely of the oat hulls and light oats left as waste from oat meal manufacture."

It distinguishes between oatmeal and ground whole oats. In Farmers' Bulletin No. 170, issued by the Department of Agriculture, it is shown that "oat feed" is recognized by the department as a by-product of oats.

The government offered testimony of a considerable number of witnesses, consumers and dealers in feeding stuffs, near Washington, St. Louis, Knoxville, Kansas City, and Montgomery. Almost with-

out exception, the result of the testimony of these witnesses when analyzed amounted to no more than their expression of opinion as to what the term "oat feed" should mean, not disclosing any knowledge of its actual meaning as understood by customers familiar with the product. Dr. Haywood, chemist of the board of food and drug inspection, Mr. Lynch, inspector, and Hon. L. F. Brown, of New York, gave the strongest testimony for the government as to what "oat feed" meant. Upon cross-examination, Dr. Haywood testified that without first telling the person that "oat feed" was a part of the label describing a compound commodity, or asking whether he was acquainted with the commodity, he would ask him what he would expect to get if he were buying *oat feed*. That practically nobody whom he interviewed had ever heard of that particular commodity, which counsel for the defense called "oat feed," and, when questioned by Dr. Haywood about the term "oat feed," the persons questioned would immediately answer, "Yes, ground oats." Dr. Haywood further testified on cross-examination that, at the time of his inquiries, a year or two before this proceeding was instituted, he had never heard the term "oat feed" used to designate ground oats, and that in his opinion the term "oat feed" meant ground oats, and that such was the result of his investigations. He further testified, on cross-examination, that he had never heard of the term "oat feed" being used to designate ground whole oats; but that "ground oats" is a term well understood throughout the length and breadth of the country; that ground oats means the oats ground up, without anything added or subtracted, the whole grain with nothing taken away or added; that he had never heard of anybody offering ground oats, crushed oats, or chopped oats or oat chops under the name "oat feed."

Mr. Brown, the Chief of the New York State Department of Agriculture, testified that the meaning of the term "oat feed" with the New York State Department of Agriculture was ground oats, either crushed, whole, or ground oats, from which nothing had been taken away or added, and that the term was so understood throughout the state. His practical experience, however, was limited to Cobleskill, a town of about 2,500 inhabitants, some 15 years ago. His testimony on this point is directly opposite to that of the numerous witnesses called by the defense as to the understanding of the term "oat feed" in New York state, and its weight is destroyed by the fact that the laws of the state of New York, relative to feed stuffs, recognize the distinction between oats and oat feed, classing the latter among the by-products. It is not unlikely that Mr. Brown's experience at Cobleskill was a confusion of the expression "feed of oats" with the commodity term "oat feed."

Mr. Lynch, the inspector, conducted his investigations along the same lines as Dr. Haywood. He would show the person of whom he inquired a copy of the label and ask what meaning it conveyed; and, if the answer should be ground oats, crushed oats, or whole oats, he would ask the person if he found out, in purchasing feed thus labeled, that he had gotten the oat refuse or by-product of an oatmeal mill, would he consider that he had been deceived? That he did not first

ascertain from the person, of whom he inquired, whether he had any knowledge of the commodity "oat feed." In most instances the person, of whom the inquiry was made, had little, if any, knowledge of by-products or any feeding stuffs except hay and in some instances wheat by-products, and they were the ones who were asked to give their opinions as to the meaning of the term "oat feed" in the Corno horse and mule feed label. Lynch states that he interviewed about 200 people in the different Southern states, and, almost without exception, they would expect to get ground or crushed oats, from looking at the term "oat feed" on the label.

The issue, however, is not what such persons with such lack of familiarity with the product would understand "oat feed" meant, but what idea the term ought to convey to persons of ordinary intelligence, who are conversant with our language. The power of Congress to pass the statute is derived solely from its authority to regulate commerce, and it must have uniform operation throughout the United States. It deals with articles of food which enter into interstate commerce. It would be unthinkable that Congress intended that a product could be seized in one district and not in another for a misleading brand, according or not as the generality of persons in those districts understood or were deceived by the brand on the particular product.

[5] Language is "the expression of thought by means of spoken or written words," and words are but signs of ideas. If a person does not know English, he cannot understand the idea or conception or sign meant to be conveyed by a word. So as to a commodity term; people unfamiliar with the term or its meaning, seeing on a label the word which stands for a commodity term, would not know what it meant, and numbers of them would state, quite honestly, that, seeing the word "oat feed" on the label, they were deceived as to what it meant and thought "oat feed" meant to describe the grain of the oat, rolled, crushed, or chopped.

All words in the beginning were arbitrary signs. They became part of the language only by common usage among the people after they had generally been accepted or taken to express or stand for a particular thought or idea. When a word obtains such currency or general acceptation, the people use it to convey that particular idea to the persons to whom it is addressed, and the word continues to have that meaning and function in the language until common usage among the people accords another and different meaning to it. Language grows and changes with the growth and changes in social and economic conditions, and expressions creep into the language by a gradual process of evolution wrought by the necessity for more precise expressions and greater convenience in depicting old ideas or new conditions and things. Words are thus being constantly coined and put in circulation, and, their meaning being generally understood among the people, they become accepted parts of our speech, sometimes for years, before they are formally acknowledged and incorporated in standard dictionaries. A century ago no one would have understood what idea was meant to be conveyed by the words "chloroform," "telephone," "tele-

graph," "aeroplane," "automobile," "X-rays," and the like. Now they are common nouns, parts of common speech, and understood by all who speak our language.

The evidence satisfies the court, if that be the only means by which it can ascertain the fact, that when our people speak of the products of a particular grain or vegetable, and use the word by which that grain or vegetable is commonly called, and add the suffix "feed," they mean to convey the idea that the substance described is the by-product of that grain or vegetable—the residue after subtracting from the grain or vegetable those parts which are useful for human food. The evidence shows that this meaning has so long been understood in the dealings between persons who buy and sell feed stuffs, and from the designation given the product, in laws, trade journals, market reports, in the newspapers, and in official publications in reference to food for man or other animals, that the term "oat feed," and other like terms, have become common nouns in our vernacular, and describe by-products, and therefore ought not to lead any one, who understands English and reads the label, to reach the conclusion that the term "oat feed" means the whole, ground, or crushed grain; especially when the term "oat feed" is used in juxtaposition with the word "oats" on the label, and inevitably implies that the "oat feed" contained in the mixture is something different from the "oats" therein.

The term "oat feed" on the label is not false, but truthfully designates that portion of the constituents of the blend which consists of the "oat feed" and is correctly described by those words. The purchaser buys the product for cattle food and knows it is put upon the market for that purpose. On the label here, after giving all the elements which enter into the blend, follows a plain statement of the qualities and nutritive values of the combined product for cattle food. After naming the elements put in the blend, the purchaser is told of the proportions of protein, sugar, starch, fat, and fiber, thus giving him additional means of ascertaining and judging of the nutritive properties and values of the product for cattle food. All who interest themselves in food supplies know, for instance, that protein serves to build up new tissues, replace broken down cells, and may also serve as a source of heat and energy, and so of the properties of sugar and starch, fat, and fiber, and their relative nutritive values. It might as well be said that the stated analysis of the product in these respects was misleading, because the manufacturer did not particularly define, in the statement in reference thereto, the offices which the different elements performed in lowering or increasing the nutritive properties of a particular product—as to the charge that the use of the word "oat feed" was misleading, because it did not go further and descend to minuteness of particulars and description of the thing of which "oat feed" consists and state on this label, descriptive of stock food, that it consisted of the residue of the grain after the most valuable parts of the oat had been subtracted by the manufacturer for human food.

The great object of the statute is to prevent injury to health and deception by putting words or devices on the label which may natu-

rally lead the purchaser to believe that he is getting one thing when in reality he is getting another. Certainly the manufacturer meets all these requirements when he truthfully describes the elements of his product by the use of common nouns which fairly describe the things which enter into it, according to the English vocabulary and adds, as he is not required to do by the federal statutes, an analysis of the life-giving properties of the different elements, thus affording additional means of judging of the real value of the blend for cattle food, the use for which it is manufactured and put upon the market.

Of course, if "oat feed" meant the whole grain of the oat, either crushed, ground, or rolled, and oat hulls were packed in the blend "in excess of the amount normally present" in whole, ground or crushed oats, the label would be misleading; but there is no ground for such charge when it is ascertained that "oat feed" does not mean the whole grain of the oat in some form, but only the by-product of the oat—"oat feed." The admission as to the quantity of oat hulls "naturally and normally present" in "oat feed" relates only to the whole grain of the oats, and not to the "oat feed," which is a mere by-product, which the term on the label correctly described. If there were a greater quantity of oat hulls in the by-product, sold under this label as "oat feed," than in such feed as generally sold, the brand "oat feed" might be misleading in that respect; but no such contention was made, and, if it had been, the proof would not sustain it. The admission of the parties as to the quantity of "oat hulls" "naturally and normally present" in "oat feed" is an admission to that extent, only in case the whole ground oats had been used in lieu of the same amount of "oat feed."

[6] Under the statute compounds known as articles of food can be sold under their own distinctive names, so long as no deleterious matter is put in the product, and the label states where the product is manufactured, and it is not an imitation sold under the distinctive name of another article. The manufacturer here would have fully obeyed the statute if he had put nothing on his product but the name "Corno Horse and Mule Feed," complying with its requirements in other respects. Such a brand would not give purchasers the hundredth part of the information of the elements and value of the product which is imparted by the more elaborate brand which was put upon the product. It would be a very harsh construction of the statute to hold that it required the forfeiture of the product on the ground that the label was misleading, because some person, unfamiliar with the commodity and the common use of language in designating it, might believe he was buying the whole oat when he was getting only the by-product, in consequence of the label, which truthfully described the product as "oat feed," not descending into greater minuteness of description and telling the particulars wherein "oat feed" differs from oats.

Let the libel be dismissed.